[Cite as *State v. Meddock*, 2018-Ohio-317.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   2016-CA-55 |
| | : | |
| v. | : | T.C. NO. 2015-CR-308 |
| | : | |
| BRETT M. MEDDOCK | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 26th day of January, 2018.

. . . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
     Attorney for Plaintiff-Appellee

MICHAEL R. PENTECOST, Atty. Reg. No. 0036803, Assistant Public Defender, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

     **{¶ 1}** Defendant-appellant Brett M. Meddock appeals his conviction and sentence for one count of murder, in violation of R.C. 2903.02(B), an unclassified felony; one count

of involuntary manslaughter, in violation of R.C. 2903.04(A), a felony of the first degree; one count of felonious assault, in violation of 2903.11(A)(1), a felony of the second degree; one count of endangering children, in violation of R.C. 2919.22(B)(1) and (E)(2)(d), a felony of the second degree; and one count of endangering children, in violation of R.C. 2919.22(A), a felony of the third degree. Meddock filed a timely notice of appeal with this Court on September 16, 2016.

{¶ 2} The record in the instant case establishes the victim, K.P., was born on September 20, 2013, to Sierra Coy and Jordan Payne.[1] Sierra and Jordan had an "on-and-off" relationship, and in early July of 2014, Sierra began dating Meddock. Sierra testified that Meddock and K.P. appeared to be bonding at first. Shortly thereafter, Meddock and Sierra began living together. The couple alternated between staying at Sierra's parents' home in Springfield, Ohio, and Meddock's mother's residence on East Cassilly Street, also located in Springfield, Ohio. Sierra testified that in October of 2014, she, K.P., and Meddock began living primarily at East Cassilly Street with Meddock's mother, Donna Swindler.

{¶ 3} Several other people resided at Donna's house, including Donna herself; Carl Hallen (Donna's boyfriend), R.S. (Donna's daughter), M.M. (Donna's son and Meddock's brother); A.M. (also Donna's son and Meddock's brother); J.H. (son of Carl); and K.H (son of Carl and Donna). Sierra's brother, C.C., also moved into Donna's house at some point between October of 2014 and January of 2015.

{¶ 4} Sierra testified that after moving into Donna's house in October of 2014, she

---

[1] The record establishes that at some point between January 20, 2015, and the beginning of Meddock's trial in the instant case, Jordan Payne died from a drug overdose.

began noticing negative changes in K.P.'s behavior. Specifically, Sierra testified that K.P., who had always been an active and healthy baby, began showing decreased appetite, decreased mobility (walking), and more crying. Donna testified that she also noticed that K.P. cried a great deal. Sierra further testified that K.P. appeared less inclined to interact with Meddock.

{¶ 5} On December 17, 2014, K.P. "collapsed" while at Donna's house. Thereafter, Sierra, Donna, and R.S. took K.P. to the Springfield Regional Medical Center. K.P. was then transferred by ambulance to Dayton Children's Hospital. Vanessa Harris, Sierra's aunt and also a nurse, came to the hospital to check on K.P. Harris testified that she observed that K.P. had bruises, a rash, was lethargic, and was unable to urinate. Bruising was also noted by medical staff at the hospital who evaluated K.P. K.P. was kept overnight at the hospital and given IV fluids. K.P. was released on December 18, 2014. Sierra and K.P went back to Donna's house after being discharged from the hospital.

{¶ 6} The record establishes that Sierra took K.P. to Springfield Regional Medical Center two days later on December 20, 2014. From there, K.P. was once again transferred to Dayton Children's Hospital where he was kept overnight. Upon being discharged on December 21, 2014, Sierra and K.P. went to stay with Jordan Payne who was living at his mother's house. On December 26, 2014, Jordan's mother informed him that Sierra and K.P. could no longer stay at her house. As a result, Sierra took K.P. back to Donna's house where Meddock was still living.

{¶ 7} On the night of January 19, 2015, Meddock, Carl, and another man left Donna's house to buy dinner for all of the people living there at the time. Carl testified

that he and Meddock smoked marijuana before returning with everyone's food at approximately 8:00 p.m. After eating, Carl testified that he left for work at approximately 8:40 p.m. Among those remaining at the house after Carl left were Donna, Sierra, K.P. and Meddock.

{¶ 8} After eating dinner, Donna fell asleep on the couch in the front room on the first floor of her house. Meddock took K.P. into the first floor bathroom and gave him a bath. At some point, Sierra testified that she heard K.P. crying in the bathroom. When she went to check, Meddock told her that K.P. had only been crying because the water was too hot. Once the bath was over, Meddock brought K.P. back into the front room and dressed him. Sierra watched television with K.P. on her lap for a short time. Carl testified that normally, Sierra would put K.P. to bed, but if she could not get him to go to sleep, Meddock would take the infant up to bed and lay down with him until he fell asleep. After K.P. fell asleep, Meddock would then come back downstairs.

{¶ 9} On the night of January 19, 2015, Sierra asked Meddock to take K.P. upstairs and put him to bed. At approximately 10:00 p.m., Meddock took K.P. upstairs to the room he shared with Sierra and the infant. Approximately twenty minutes later, Sierra went upstairs to check on K.P. Upon entering the bedroom, Sierra observed K.P. in the fold-out playpen where he normally slept. Sierra also observed Meddock sitting on the bed smoking a cigarette and using his phone. Sierra remained in the room for approximately five minutes and then went back downstairs. Sierra testified that she went back upstairs to check on K.P. and Meddock approximately twenty minutes later.

{¶ 10} At approximately 12:00 a.m., Meddock brought K.P. downstairs in order to change his diaper. While Meddock was changing K.P.'s diaper, Donna, who was still

sleeping on the couch, testified that she heard the infant crying. After he finished changing K.P.'s diaper, Meddock went back upstairs and took the infant into the bedroom shared by Carl and Donna. At the same time, Sierra was in the bedroom she shared with Meddock and K.P. Sierra testified that she briefly checked on K.P. and Meddock while they were in the other bedroom, and then went back to her bedroom.

{¶ 11} Donna testified that at approximately 1:00 a.m., she woke up from the couch and went upstairs to her bedroom with her son, K.H. Upon entering her bedroom, Donna observed K.P. and Meddock laying on her bed and asked why they were there. Without answering, Meddock got up and took K.P. into the bedroom of A.M. Donna turned on the box fan in her room, got in bed, and went to sleep with K.H. in the bed next to her.

{¶ 12} Sierra testified that approximately twenty minutes later, Meddock brought K.P. back into her bedroom, placed the infant into the playpen, and sat down on the edge of the bed. While he was in the playpen, K.P. drank a cup of juice and then quickly drank another cup of water. Sierra testified that it was unusual for K.P. to drink that quickly. Upon finishing the cup of water, K.P. began having trouble breathing. Sierra gave K.P. a breathing treatment, after which she thought his breathing improved somewhat. However, K.P. began making a gurgling sound, and Sierra asked Meddock to bring the infant to her. Instead, Sierra testified that Meddock laid K.P. down on the bed next to him. Sierra testified that she had to ask Meddock several times to give her the infant before he finally did so. At that point, Meddock went into Donna's to tell her that K.P. was not breathing.

{¶ 13} Meddock then took K.P. downstairs and began performing CPR on the infant who vomited. Sierra, also downstairs at this point, called an ambulance.

Meddock placed K.P. on the floor after being instructed to do so by the 911 operator. Sierra testified that K.P. had turned very pale and was clenching his teeth.

{¶ 14} Springfield Police Officer Jerome Montico was dispatched to East Cassilly at 3:42 a.m. on a report of an infant that was not breathing. Upon arriving at the residence, Officer Montico entered and observed Meddock standing next to K.P. Officer Montico testified that he immediately checked K.P. for a pulse. After finding no pulse, Officer Montico placed K.P. on a countertop and began performing CPR. Paramedics arrived shortly thereafter and transported K.P. to the Springfield Regional Medical Center. Officer Montico then took Sierra to the hospital. Attempts to revive K.P. by doctors at the hospital were unsuccessful, and K.P. was pronounced dead.

{¶ 15} Springfield Police Detective Trent King was called in to respond to the Springfield Regional Medical Center to investigate the incident. Upon arriving at the hospital, Detective King was informed that K.P. had passed. The detective also spoke with Sierra and the attending emergency room physician. Thereafter, Detective King traveled to East Cassilly Street where he spoke with Donna and Meddock. Meddock did not disclose that he had been alone with K.P. and stated that he did not know of any injuries suffered by the infant during the night or early morning.

{¶ 16} Detective King then traveled to the Montgomery County Coroner's Office where he was informed that the autopsy revealed that K.P.'s death was not accidental. Dr. Bryan Casto from the Montgomery County Coroner's Office performed the autopsy and testified at trial. Specifically, the autopsy revealed that K.P. had suffered a recent, deep bruise on the back of his head close to the brain which was produced by repeated blows. Dr. Casto testified that this injury alone could have caused K.P.'s death. K.P.

was also found to have a fresh accumulation of blood on the brain (subdural hematoma) as well as brain swelling. Blood was discovered in K.P.'s spinal column which Dr. Casto testified could have been a separate injury caused by a trauma to the back of the infant's head.

{¶ 17} Additionally, K.P. suffered a traumatic aortic dissection, a tearing of the aorta in the heart. Dr. Andrew Christian Retzinger testified that for a traumatic aortic dissection to occur, a large amount of force would be required. Dr. Casto testified that the traumatic aortic dissection caused a hemothorax to develop in K.P.'s chest cavity, that is a large pooling of blood that pushed his heart and lungs aside. The hemothorax would have resulted in breathing difficulty for K.P. The amount of blood found in K.P.'s chest cavity was measured to be 250 milliliters, about one-quarter of his entire blood supply.

{¶ 18} Dr. Casto further testified that the autopsy revealed that K.P. had suffered older injuries in various stages of healing. K.P. was found to have several older, healing bruises on his right forehead, his left jaw area, and close to his left ear. K.P. had a close grouping of four older bruises on his lower abdomen which Dr. Casto testified was consistent with the mark left from a balled fist. K.P. also suffered from older fractures to four of his left-side ribs that were in various stages of healing. Dr. Casto testified that the rib fractures were not consistent with any type of CPR-related injury. Rather, Dr. Casto testified that the rib injuries were caused by someone squeezing K.P. too hard.

{¶ 19} Thereafter, Detective King interviewed both Sierra and Meddock. Detective King testified that Sierra's interview provided no information that would have accounted for any of the injuries suffered by K.P. While he could not provide any

explanation for the injuries suffered by K.P., Meddock told Detective King about a "play wrestling" incident on the bed with the infant which occurred sometime earlier. At no time during the initial interview did Meddock disclose to Detective King that he had been alone with K.P. for a significant amount of time when the infant suffered lethal injuries.

{¶ 20} Detective King testified that in an interview with Donna on February 9, 2015, he learned that Meddock had been alone with K.P. on the night of January 19, 2015. In a subsequent interview with Sierra on February 17, 2015, she confirmed that Meddock had been alone with K.P. for a significant amount of time on the night in question.

{¶ 21} On June 22, 2015, Meddock was indicted for one count of murder, one count of involuntary manslaughter, one count of felonious assault, and two counts of endangering children. At his arraignment on June 25, 2015, Meddock pled not guilty to all of the charges contained in the indictment.

{¶ 22} During the pendency of the case, the parties entered into a stipulated polygraph agreement which encompassed admissibility of the results at trial. The record establishes that a polygraph examination was administered to Meddock on December 19, 2015. Polygraph Examiner Douglas Wells testified that he asked Meddock the following three questions which were pertinent to the charges against him, to wit:

1) Did you personally cause the injuries that caused [K.P.]'s death?

2) Did you cause [K.P.]'s death by some form of physical assault that you've never told the truth about?

3) Did you strike the blow that led to [K.P.]'s death?

Meddock answered "no" to each of the three questions. However, Wells testified that Meddock was deceptive in his answer to all three questions.

{¶ 23} We also note that prior to trial, the police recorded a telephone call from jail wherein Meddock spoke with his mother, Donna. During the conversation, Meddock told Donna that K.P.'s head had struck the doorframe as they left her bedroom in the early morning hours of January 20, 2015. The police also recorded a conversation between Meddock and his brother, M.M., when the latter visited Meddock at the jail on December 30, 2015. During the conversation, Meddock admitted that he injured K.P. on purpose because the infant "wouldn't stop crying and sh**." During the conversation with his brother, Meddock also stated that K.P.'s head had struck a different doorframe than the one he had told his mother about in the earlier recorded conversation.

{¶ 24} Meddock's jury trial was held on August 23, 2016, through August 26, 2016. Meddock was found guilty on all of the charged offenses. At his sentencing hearing on September 14, 2016, the trial court merged the murder count with the involuntary manslaughter count. The trial court also merged the felonious assault with the two counts for endangering children. The State elected to have Meddock sentenced on Count I (murder) and Count IV (endangering children, a felony of the second degree). The trial court sentenced Meddock to fifteen years to life in prison for Count I, and eight years for Count IV. The trial court ordered that the sentences be served consecutively for an aggregate sentence of twenty-three years to life in prison.

{¶ 25} It is from this judgment that Meddock now appeals.

{¶ 26} Meddock's sole assignment of error is as follows:

{¶ 27} "THE JUDGMENT OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 28} In his sole assignment, Meddock contends that the jury's verdict finding him

guilty on all counts was against the manifest weight of the evidence. Specifically, Meddock argues that that none of the evidence adduced by the State conclusively established that he, and not Sierra or Donna, inflicted the injuries to K.P. which ultimately caused his death. We note that Meddock *does not* dispute the evidence adduced by the State establishing that the fatal injuries suffered by K.P. were intentionally inflicted, and not the result of an accidental fall or the administration of CPR.

{¶ 29} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 30} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley,* 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 31} As previously stated, Meddock dos not dispute that the elements of the charged offenses were met. Rather, he argues that the manifest weight of the evidence fails to establish that he is the individual who committed the offenses against K.P.

{¶ 32} Upon review, we conclude that Meddock's convictions are not against the

manifest weight of the evidence. The credibility of the witnesses and the weight to be given their testimony are matters for the jury to resolve. *State v. Benton,* 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7. Here the jury quite reasonably could have credited the extensive testimony provided by the State's witnesses, evaluated said evidence and all reasonable inferences, including who was the perpetrator, and thereafter, found Meddock guilty. The evidence presented by the State, if believed, demonstrated that K.P. sustained blunt-force trauma to his head and chest, as well as a traumatic aortic tear, while in Meddock's exclusive custody and care, which resulted in K.P.'s death. *See State v. Cook*, 2010-Ohio-6222, 970 N.E.2d 1020, ¶ 34 (2d Dist.); *State v. King,* 179 Ohio App.3d 1, 2008-Ohio-5363, 900 N.E.2d 645, ¶ 44 (2d Dist.).

{¶ 33} We further conclude that despite the fact that there were no eyewitnesses to the actual injury, the evidence supports a finding that the harm was not caused by an accidental fall or the administration of CPR to K.P. To the contrary, the evidence supports a finding that the injury occurred during the time that Meddock had exclusive care and control of K.P. The record establishes that Meddock had ample time with K.P. on the night of January 19, 2015, and morning of January 20, 2015, to cause the serious physical harm that resulted in the infant's death.

{¶ 34} Additionally, we note that Meddock failed the polygraph examination as it related to any of the questions regarding his involvement in K.P.'s death. We also note that Meddock never informed the police that he had had exclusive care and control of K.P. for a significant amount of time on the night that the injuries occurred. Finally, Meddock even admitted to his brother, M.M., that he intentionally injured K.P. because the infant "wouldn't stop crying and sh**." Accordingly, having reviewed the entire

record, we cannot clearly find that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice has occurred.

**{¶ 35}** Meddock's sole assignment of error is overruled.

**{¶ 36}** Meddock's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Andrew P. Pickering
Michael R. Pentecost
Hon. Richard J. O'Neill